Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERROL BROWN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>INNERWORKINGS, INC., ERIC D. BELCHER, RYAN K. SPOHN, JEFFREY P. PRITCHETT, AND CHARLES HODGKINS,<br><br>Defendants. | No. 8:18-CV-00832-CJC-KES<br><br>**AMENDED CLASS ACTION COMPLALNT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Nancy Routhier ("Plaintiff"), by her undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the

investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding InnerWorkings, Inc. ("InnerWorkings" or the "Company"), analysts' reports and advisories about the Company, interviews with former employees of the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired publicly traded securities of InnerWorkings from August 10, 2015 through May 7, 2018, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

2. Throughout the Class Period, Defendants InnerWorkings, Eric D. Belcher ("Belcher"), its Chief Executive Officer ("CEO"), Ryan K. Spohn ("Spohn"), its interim Chief Financial Officer ("CFO") from March 9, 2015 until August 2015, Jeffrey P. Pritchett ("Pritchett"), its CFO from August 2015 until

December 6, 2017, and Charles Hodgkins ("Hodgkins"), its interim CFO since December 2017, knowingly or recklessly disseminated materially false and misleading financial statements.

3. InnerWorkings is a global marketing execution firm serving Fortune 1000 brands across a wide range of industries. InnerWorkings offers professional services, intelligence on data and sourcing, and technology to its clients, who include major corporations such as Comcast, Adidas, and Pizza Hut.

4. On December 6, 2017, InnerWorkings announced the resignation of its CFO, Defendant Pritchett, effective immediately, "due to personal matters inconsistent with Company policy." This was an abrupt change, and there was turmoil concerning Pritchett's exit, both in the Company and in the finance function. Before and at that time, the finance function lacked appropriate processes and defined responsibilities such that the Company's internal controls were ineffective.

5. On a March 12, 2018 conference call with investors held after market close, Defendants disclosed that there was a material weakness in the Company's internal controls over financial reporting. Defendant Hodgkins told analysts that, during the process of implementing new revenue recognition standards jointly issued by the Financial Accounting Standards Board ("FASB") and International Accounting Standards Board ("IASB") that went into effect for 2018,

InnerWorkings concluded that it had a material weakness in internal controls over financial reporting as of December 31, 2017. He reassured investors, however, that "[t]his, of course, won't impact our current or previously reported financials which remain correct, as stated."

6. On this news, the Company's stock dropped over 5.5%, falling from a closing price of $9.66 per share on March 12, 2018 to close at $9.13 per share on March 13, 2018.

7. On March 16, 2018, InnerWorkings filed its annual report on Form 10-K for the fiscal year ending December 31, 2017, identifying the material weaknesses it had disclosed four days earlier as relating to revenue recognition and compensation expense controls. The Company admitted that its controls were ineffective to recognize revenue at appropriate times in the accounting process.

8. Less than two months later, on May 7, 2018, InnerWorkings issued a press release entitled, "InnerWorkings Postpones Release of First Quarter 2018 Financial Results." The press release disclosed that the Company's financial statements for ***three years*** – the years ended December 31, 2017, 2016, and 2015, and all interim periods within those years – contained "errors," requiring Defendants to restate the Company's financial results. Defendants attributed the necessary restatement to accounting "errors" that related primarily to recording a portion of costs of goods sold in the wrong period, and falsely stated that they had

no material impact on InnerWorkings' cash flow, revenue, or liquidity. Based on a preliminary assessment, the Company anticipated the aggregate impact of its accounting violations to create a decrease in income of $2.5 - $4.5 million for 2017, $1.5 - $2.5 for 2016, and $0.5 - $1.5 for 2015. The Company's shares fell $0.62 per share, or 6.4%, closing at $9.06 per share on May 8, 2018, from a $9.68 close on May 7, 2018.

9. In an amended annual report on Form 10-K/A filed with the SEC on July 27, 2018 ("Restatement"), InnerWorkings provided revised and restated financial results. Directly contrary to Defendants' statements that the Restatement had nothing to do with revenue, the Restatement showed that the Company had identified "errors" primarily related to the timing of (i) revenue recognition for goods shipped and services performed and (ii) cost of goods sold for certain orders that were not recorded in the period in which the end product was sold to the customer and revenue was recognized. These "errors" were actually accounting violations, and had a material impact of InnerWorkings' net income and earnings per share. As a result, the Company restated its financial statements for the years ended December 31, 2017 and 2016, and voluntarily revised its financial statements related to the recording of cost of goods sold for 2015.[1]

---

[1] The Restatement as attached as Exhibit 1, and is incorporated by reference in this Amended Complaint.

10. The Restatement corrected four primary violations of accounting principles, all of which involved the cost of goods sold being recorded in an incorrect time period. First, it corrected a report Defendants used to support the reconciliation of accrued accounts payable. This correction increased the cost of goods sold by $2.2 million for the year ended December 31, 2017 and increased accounts payable by $3.0 million and $0.8 million as of December 31, 2017 and December 31, 2016, respectively.

11. Second, the Restatement corrected the Company's revenue recognition for free on board destination contracts, providing that InnerWorkings maintain risk of loss on products until they arrive at the customer's location. Defendants incorrectly recognized revenue on these contracts at the time of shipment, rather than deferring revenue until they delivered the products. This correction increased revenue by $3.4 million and $2.7 million for the years ended December 31, 2017 and 2016, respectively, increased cost of goods sold by $2.8 million and $2.1 million for the years ended December 31, 2017 and 2016, respectively, increased inventory by $2.3 million and $3.3 million as of December 31, 2017 and 2016, respectively, increased accounts payable $1.8 million as of December 31, 2017, and decreased unbilled revenue by $1.8 million as of December 31, 2016.

12. Third, the Restatement admitted that the Company had wrongfully recognized revenue for inventory for which customers had paid that remained at its

warehouses. While Defendants designated this inventory as "customer-owned" as soon as the customer paid, under generally accepted accounting principles ("GAAP"), Defendants should not have recognized the revenue until the Company actually shipped the inventory to the customer. As a result of these GAAP violations, the Company increased its deferred revenue by $4.1 million and $4.3 million as of December 31, 2017 and 2016, respectively, and increased inventory by $3.3 million and $3.6 million as of December 31, 2017 and 2016, respectively.

13. Fourth, the Restatement disclosed that InnerWorkings had neglected to identify earned revenue from certain customer orders that it had not invoiced in 2017 in the financial close process for the year. According to Defendants, that correction increased the Company's revenue by $1.0 million in 2017, increased accounts payable by $1.3 million and $0.9 million as of December 31, 2017 and 2016, respectively, and increased unbilled revenue by $2.1 million and $1.0 million as of December 31, 2017 and 2016.

14. On a July 31, 2018 conference call with investors, Defendants described these accounting violations as "unfortunate errors resulting from the manual processes in our accounting and operations functions in which we are investing to fix."

15. Defendants failed to recognize revenue and prepare financial statements in accordance with GAAP.[2] Material weaknesses in internal controls at InnerWorkings of which Defendants knew or recklessly disregarded led Defendants to prepare and to disseminate inaccurate financial statements.

16. As a direct and proximate result of Defendants' knowing or reckless wrongdoing for eleven quarters, Plaintiff and the Class have suffered damages.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as the Company conducts business and maintains an office in this District.

---

[2] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

20. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

21. As listed in her Certification, filed with her Lead Plaintiff Motion in this case (ECF No. 19-2), incorporated herein by reference in its entirety, Lead Plaintiff Nancy Routhier acquired InnerWorkings securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22. Defendant InnerWorkings provides marketing execution solutions in North America and internationally. The Company's software applications and databases create an integrated solution that stores, analyzes, and tracks the production capabilities of its supplier network, as well as detailed pricing data. InnerWorkings is a Delaware corporation with its headquarters located at 600 West Chicago Avenue, Suite 850, Chicago, IL 60654. InnerWorkings securities trade on the NASDAQ under the ticker symbol "INWK."

23. Defendant Belcher was the Company's CEO from the beginning of the Class Period until April 2018, when he transitioned to a role as the Executive Chairman of InnerWorkings' Board of Directors.

24. Defendant Spohn served as the Company's interim CFO from March 9, 2015 until August 2015.

25. Defendant Pritchett served as the Company's CFO from August 2015 until his resignation on December 6, 2017.

26. Defendant Hodgkins has been the Company's interim CFO since December 2017.

27. Defendants Belcher, Spohn, Pritchett, and Hodgkins are sometimes referred to herein as the "Individual Defendants."

28. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the federal securities laws.

29. InnerWorkings is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

30. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to InnerWorkings under *respondeat superior* and agency principles.

31. Defendant InnerWorkings and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV. **BACKGROUND**

32. InnerWorkings described itself in the Restatement as "a leading global marketing execution firm for some of the world's most marketing intensive companies, including those listed in the Fortune 1000." The Company's business is

primarily the procurement of marketing materials, branded merchandise, product packaging and retail displays. InnerWorkings described its business and products in the Restatement as follows:

> As a comprehensive outsourced global solution, we leverage proprietary technology, an extensive supplier network and deep domain expertise to streamline the creation, production and distribution of marketing and promotional materials, signage and displays, retail experiences, events and promotions and product packaging across every major market worldwide. The items we source generally are procured through the marketing supply chain and we refer to these items collectively as marketing materials. Through our network of more than 8,000 global suppliers, we offer a full range of fulfillment and logistics services that allow us to procure marketing materials of virtually any kind. The breadth of our product offerings and services and the depth of our supplier network enable us to fulfill the marketing materials procurement needs of our clients.
>
> Our proprietary software applications and databases create a fully-integrated solution that stores, analyzes and tracks the production capabilities of our supplier network, as well as detailed pricing data. As a result, we believe we have one of the largest independent repositories of supplier capabilities and pricing data for suppliers of marketing materials around the world. We leverage our supplier capabilities and pricing data to match our orders with suppliers that are optimally suited to meet the client's needs at a highly competitive price. Our technology and databases of product and supplier information are designed to capitalize on excess manufacturing capacity and other inefficiencies in the traditional marketing materials supply chain to obtain favorable pricing while delivering high-quality products and services for our clients.

> By leveraging our technology and data, our clients are able to reduce overhead costs, redeploy internal resources and obtain favorable pricing and service terms. In addition, our ability to track individual transactions and provide customized reports detailing procurement activity on an enterprise-wide basis provides our clients with greater visibility and control of their marketing materials expenditures.
>
> We generate revenue by procuring and purchasing marketing materials from our suppliers and selling those products to our clients. We procure products for clients across a wide range of industries, such as retail, financial services, hospitality, consumer packaged goods, non-profits, healthcare, pharmaceuticals, food and beverage, broadcasting and cable and transportation.

33. According to the Restatement, InnerWorkings "recognizes revenue for creative, design, installation, warehousing and other services provided to its customers which may be delivered in conjunction with the procurement of marketing materials at the time when delivery and customer acceptance occur and all other revenue recognition criteria are met. When provided on a stand-alone basis, the Company recognizes revenue for these services upon completion of the service. Service revenue has not been material to the Company's overall revenue to date."

34. The Company's payment terms with customers are generally 30 to 90 days from the invoice date, and accounts receivables are stated at the amount billed to the customer, less an estimate for potential bad debts. Interest does not generally accrue on outstanding balances.

35. The Company's inventories are stated at the lower of cost or net realizable value. Cost is determined by the first-in, first-out method. Net realizable value is based upon an estimated average selling price reduced by estimated costs of disposal. Inventories primarily consist of purchased finished goods, which include consigned inventory held on behalf of customers as well as inventory held at third-party fulfillment centers and subcontractors.

36. In InnerWorkings' annual report on Form 10-K for the fiscal year ended December 31, 2014 (the "2014 10-K"), the Company described its critical accounting policy concerning revenue recognition leading into 2015, when material weaknesses in internal controls caused it to improperly report revenue recognition and cost of goods. The 2014 10-K stated:

> ***Revenue Recognition***
>
> We recognize revenue upon meeting all of the following revenue recognition criteria, which is typically met upon shipment or delivery of our products to customers: (i) persuasive evidence of an arrangement exists through customer contracts and orders, (ii) the customer takes title and assumes the risks and rewards of ownership, (iii) the sales price charged is fixed or determinable as evidenced by customer contracts and orders, and (iv) collectability is reasonably assured. Unbilled revenue relates to shipments that have been made to customers for which the related account receivable has not yet been billed.
>
> In accordance with ASC 605-45, *Revenue Recognition – Principal Agent Considerations*, we generally report revenue on a gross basis because we are the primary obligor in our arrangements to procure marketing

> materials and other products for our customers. Under these arrangements, we are responsible for the fulfillment, including the acceptability, of the marketing materials and other products. In addition, we (i) determine which suppliers are included in our network, (ii) have discretion to select from among the suppliers within our network, (iii) are obligated to pay our suppliers regardless of whether we are paid by our customers, and (iv) have reasonable latitude to establish exchange price. In some transactions, we also have general inventory risk and are involved in the determination of the nature or characteristics of the marketing materials and products. When we are not the primary obligor, revenues are reported on a net basis.
>
> We recognize revenue for creative and other services provided to our customers which may be delivered in conjunction with the procurement of printed materials at the time when delivery and customer acceptance occur and all other revenue recognition criteria are met. We recognize revenue for creative and other services provided on a stand-alone basis upon completion of the service. Service revenue has not been material to our overall revenue to date.

37. The Company maintained this policy for revenue recognition throughout the Class Period.

38. According to the Company's annual report on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K"), with respect to revenue:

> We generate revenue through the procurement of marketing materials for our clients. Our annual revenue was $1,029.4 million, $1,000.1 million and $891.0 million in 2015, 2014 and 2013, respectively, reflecting growth rates of 2.9% and 12.3% in 2015 and 2014, respectively, as compared to the corresponding prior year. Our revenue is generated from two different types of

clients: enterprise and transactional. Enterprise clients usually order marketing materials in higher dollar amounts and volume than our transactional clients. We categorize a client as an enterprise client if we have a contract with the client for the provision of marketing materials on a recurring basis; if the client has signed an open-ended purchase order, or a series of related purchase orders; or if the client has enrolled in our e-stores program, which enables the client to make online purchases of marketing materials on a recurring basis. We categorize all other clients as transactional. We enter into contracts with our enterprise clients to provide some or a specific portion of their marketing products on a recurring basis. Our contracts with enterprise clients are generally three to five years, subject to termination by either party upon prior notice ranging from 90 days to twelve months.

Several of our enterprise clients have outsourced substantially all of their recurring marketing materials needs to us. We provide marketing materials to our transactional clients on an order-by-order basis. For the years ended December 31, 2015, 2014 and 2013, enterprise clients accounted for 85%, 79% and 77% of our revenue, respectively, while transactional clients accounted for 15%, 21% and 23% of our revenue, respectively.

Our revenue consists of the prices paid to us by our clients for marketing materials. These prices, in turn, reflect the amounts charged to us by our suppliers plus our gross profit. Our gross profit margin, in the case of some of our enterprise clients, is fixed by contract or, in the case of transactional clients, is dependent on prices negotiated on a job-by-job basis. Once either type of client accepts our pricing terms, the selling price is established and we procure the product for our own account in order to re-sell it to the client. ***We take full title and risk of loss for the product upon shipment. The finished product is typically shipped directly from our supplier to a***

> ***destination specified by our client. Upon shipment, our supplier invoices us for its production costs and we invoice our client***.
>
> Our revenue from enterprise clients tends to generate lower gross profit margins than our revenue from transactional clients because the gross profit margins established in our contracts with large enterprise clients are generally lower than the gross profit margins typically realized in our transactional business. Although our enterprise revenue generates lower gross profit margins, our enterprise business tends to be as profitable as our transactional business on an operating profit basis because the commission expense associated with enterprise clients is generally lower. (Emphasis added).

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

39. The Class Period begins on August 10, 2015, when InnerWorkings filed a Form 10-Q for the quarter ended June 30, 2015 (the "2Q 2015 10-Q") with the SEC, providing the Company's second quarter 2015 financial statements and position. When combined with the rest of 2015, the Company's 2Q 2015 10-Q misreported revenue, cost of goods sold, gross profit, selling, general and administrative expenses, loss from operations, loss before taxes, income tax expense, net loss, basic loss per share, diluted loss per share, comprehensive loss, bad debt provision, deferred income taxes, accounts receivable and unbilled revenue, inventories, prepaid expenses and other assets, accounts payable, and accrued expenses and other liabilities.

40. The 2Q 2015 10-Q was materially false and misleading. Defendants InnerWorkings, Belcher, and Spohn knew or recklessly disregarded that the 2Q 2015 10-Q included materially false financial statements. The Company ultimately revised its financial statements for 2015 in the Restatement.

41. The 2Q 2015 10-Q also stated that the Company's disclosure controls and procedures were effective as of June 30, 2015. It further explained that InnerWorkings was in the process of implementing a new global enterprise resource system that would include modifications to the design and operation of internal controls, but assured investors that the Company was testing internal controls over financial reporting prior to the implementation of each stage and had monitoring controls over the implementation in place. Specifically, Defendants told investors:

> **Evaluation of Disclosure Controls and Procedures**
>
> Under the supervision and with the participation of our chief executive officer and chief financial officer, we evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2015. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in

the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of June 30, 2015, our chief executive officer and chief financial officer concluded that, as of such date, the Company's disclosure controls and procedures were effective at the reasonable assurance level.

**Changes in Internal Control Over Financial Reporting**

In the third quarter of 2013, we began the implementation of a new global enterprise resource planning system which includes the implementation of shared service centers in some regions. This multi-year initiative will be conducted in phases and will include modifications to the design and operation of internal controls over financial reporting. We are testing internal controls over financial reporting for design effectiveness prior to implementation of each phase, and we have monitoring controls in place over the implementation of these changes.

***Except as described above, there have been no other changes in our internal control over financial reporting (as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) during the quarter ended June 30, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.) The 2Q 2015 10-Q was signed by Defendants Belcher and Spohn. The 2Q 2015 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Belcher and Spohn attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

42. The 2Q 10-Q was materially false and misleading because Defendants InnerWorkings, Belcher, and Spohn knew or recklessly disregarded that there were material weaknesses in the Company's internal controls due to four primary violations, all of which involved the cost of goods sold being recorded in an incorrected time period: an "error" in a report used to support the reconciliation of accrued accounts payable, improper reporting of revenue recognition for free on board destination contracts, wrongfully recognized revenue for inventory at its warehouses for which customers had paid but that had not been shipped to customers, and the failure to identify revenue from certain customer orders that was earned but not invoiced in 2017 in the financial close process. In fact, the Company's internal controls were inadequate to: (i) ensure revenue was recognized when the risk of loss transferred from the Company to the customer based on an analysis of customer arrangements and delivery terms, (ii) retain and review customer order documentation, including support for assessing whether pricing was fixed and determinable, and (iii) estimate the impact of future credit memos. These

deficiencies caused InnerWorkings' reported revenue to be unreliable, as well as its unbilled revenue, inventory and cost of sales. In addition, the Company's internal controls were ineffective in relation to the design and operation of the review controls over compensation, rendering its compensation expenses unreliable. As a result, on July 27, 2018, InnerWorkings revised its financial results for 2015, correcting statements related to revenue and cost of goods sold.

43. On November 6, 2015, InnerWorkings filed a Form 10-Q for the quarter ended September 30, 2015 (the "3Q 2015 10-Q") with the SEC, which provided the Company's third quarter 2015 financial statements and position. When combined with the rest of 2015, the Company's 3Q 2015 10-Q misreported revenue, cost of goods sold, gross profit, selling, general and administrative expenses, loss from operations, loss before taxes, income tax expense, net loss, basic loss per share, diluted loss per share, comprehensive loss, bad debt provision, deferred income taxes, accounts receivable and unbilled revenue, inventories, prepaid expenses and other assets, accounts payable, and accrued expenses and other liabilities.

44. The 3Q 2015 10-Q was materially false and misleading. Defendants InnerWorkings, Belcher, and Pritchett (who joined the Company in August 2015) knew or recklessly disregarded that the 3Q 2015 10-Q included materially false

financial statements. The Company ultimately revised its financial statements for 2015 in the Restatement.

45. The 3Q 2015 10-Q reiterated the assurances made to investors about the Company's internal controls in the 2Q 2015 10-Q, stating:

> **Evaluation of Disclosure Controls and Procedures**
>
> Under the supervision and with the participation of our chief executive officer and chief financial officer, we evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2015. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.
>
> Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of June 30, 2015, our chief executive officer and chief financial

> officer concluded that, as of such date, the Company's disclosure controls and procedures were effective at the reasonable assurance level.
>
> **Changes in Internal Control Over Financial Reporting**
>
> In the third quarter of 2013, we began the implementation of a new global enterprise resource planning system which includes the implementation of shared service centers in some regions. This multi-year initiative will be conducted in phases and will include modifications to the design and operation of internal controls over financial reporting. We are testing internal controls over financial reporting for design effectiveness prior to implementation of each phase, and we have monitoring controls in place over the implementation of these changes.
>
> ***Except as described above, there have been no other changes in our internal control over financial reporting (as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) during the quarter ended September 30, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.) The 3Q 2015 10-Q was signed by Defendants Belcher and Pritchett (the latter of whom joined the Company effective August 2015), and contained signed SOX certifications by Defendants Belcher and Pritchett attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

46. The 3Q 2015 10-Q was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded

that there were material weaknesses in the Company's internal controls due to four primary violations, all of which involved the cost of goods sold being recorded in an incorrected time period: an "error" in a report used to support the reconciliation of accrued accounts payable, improper reporting of revenue recognition for free on board destination contracts, wrongfully recognized revenue for inventory at its warehouses for which customers had paid but that had not been shipped to customers, and the failure to identify revenue from certain customer orders that was earned but not invoiced in 2017 in the financial close process. In fact, the Company's internal controls were inadequate to: (i) ensure revenue was recognized when the risk of loss transferred from the Company to the customer based on an analysis of customer arrangements and delivery terms, (ii) retain and review customer order documentation, including support for assessing whether pricing was fixed and determinable, and (iii) estimate the impact of future credit memos. These deficiencies caused InnerWorkings' reported revenue to be unreliable, as well as its unbilled revenue, inventory and cost of sales. In addition, the Company's internal controls were ineffective in relation to the design and operation of the review controls over compensation, rendering its compensation expenses unreliable. As a result, on July 27, 2018, InnerWorkings revised its financial results for 2015, correcting statements related to revenue and cost of goods sold.

47. On March 10, 2016, InnerWorkings filed an annual report on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") with the SEC, which provided the Company's annual financial statements and position. The 2015 10-K reported revenue of $1,029,353,000, cost of goods sold of $789,159,000, gross profit of $240,194,000, selling, general and administrative expenses of $197,291,000, a $13,093,000 loss from operations, a $20,771,000 loss before taxes, income tax expense of $12,292,000, a $33,063,000 net loss, a basic loss of $0.63 per share, a diluted loss of $0.63 per share, a comprehensive loss of $41,655,000, a bad debt provision of $1,949,000, deferred income taxes of $6,947,000, accounts receivable and unbilled revenue of negative $10,361,000, inventories of negative $8,188,000, prepaid expenses and other assets of negative $6,138,000, accounts payable of $26,199,000, and accrued expenses and other liabilities of $2,118,000.

48. The 2Q 2015 10-Q was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that in fact the Company's revenue was $1,028,892,000, cost of goods sold was $788,862,000, gross profit was $240,030,000, selling, general and administrative expenses were $197,247,000, its loss from operations was $13,213,000 its loss before taxes was $20,891,000, income tax expense was $11,498,000, its net loss was $32,389,000 net loss, its basic loss per share was $0.61, its diluted loss per share was $0.61, its comprehensive loss was $40,640,000, its bad debt provision

was $1,685,000, it had deferred income taxes of $5,879,000, its accounts receivable and unbilled revenue were in the negative by $10,580,000, its inventories were in the negative by $9,676,000, its prepaid expenses and other assets were negative $4,140,000, its accounts payable were $25,102,000, and its accrued expenses and other liabilities were $3,582,000.

49. Defendants stated that in the Restatement that they did not find these corrections to be material. According to the SEC Staff Accounting Bulletins, Topic 1.M., Assessing Materiality, however, that each of these reports is a unit that may be measured precisely, is a factor that may render material a quantitatively small misstatement of a financial statement item. The SEC additionally notes that multiple misstatements should be considered both individually and in the aggregate for materiality. Nearly every unit reported on the consolidated balance sheet for 2015 was incorrect. Furthermore, the SEC considers how a misstatement arose to be part of an assessment of whether a misstatement results in a violation of a registrant's duty to keep books and records "in reasonable detail." In this case, Defendants have admitted that these misstatements arose due to material weaknesses in internal controls.

50. The 2015 10-K repeated the assurances made to investors about the Company's internal controls in the 2Q 2015 10-Q and 3Q 2015 10-Q, stating:

**Evaluation of Disclosure Controls and Procedures.**

Under the supervision and with the participation of our chief executive officer and chief financial officer, we evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2015. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of December 31, 2015, our chief executive officer and chief financial officer concluded that, as of such date, the Company's disclosure controls and procedures were effective at the reasonable assurance level.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Our internal control

system was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the consolidated financial statements for external purposes in accordance with generally accepted accounting principles.

Management assessed the design and effectiveness of the Company's internal control over financial reporting as of December 31, 2015. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control—Integrated Framework* (2013 framework). Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2015 based on criteria in *Internal Control –Integrated Framework* issued by the COSO.

As required under this Item 9A, the management's report titled "Management's Assessment of Control over Financial Reporting" is set forth in "Item 8 - Consolidated Financial Statements and Supplementary Data" and is incorporated herein by reference.

**Attestation Report of Registered Public Accounting Firm**

As required under this Item 9A, the auditor's attestation report titled "Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting" is set forth in "Item 8 - Consolidated Financial Statements and Supplementary Data" and is incorporated herein by reference.

**Changes in Internal Control Over Financial Reporting**

In the third quarter of 2013, we began the implementation of a new global enterprise resource planning system. This multi-year initiative will be conducted in phases and will

> include modifications to the design and operation of controls over financial reporting. We are testing internal controls over financial reporting for design effectiveness prior to implementation of each phase, and we have monitoring controls in place over the implementation of these changes.
>
> ***There have been no other changes in our internal control over financial reporting (as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) during the quarter ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.) The 2015 10-K was signed by Defendants Belcher and Pritchett. The 2015 10-K contained signed SOX certifications by Defendants Belcher and Pritchett attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

51. This was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that there were material weaknesses in the Company's internal controls due to four primary violations, all of which involved the cost of goods sold being recorded in an incorrected time period: an "error" in a report used to support the reconciliation of accrued accounts payable, improper reporting of revenue recognition for free on board destination contracts, wrongfully recognized revenue for inventory at its

warehouses for which customers had paid but that had not been shipped to customers, and the failure to identify revenue from certain customer orders that was earned but not invoiced in 2017 in the financial close process. In fact, the Company's internal controls were inadequate to: (i) ensure revenue was recognized when the risk of loss transferred from the Company to the customer based on an analysis of customer arrangements and delivery terms, (ii) retain and review customer order documentation, including support for assessing whether pricing was fixed and determinable, and (iii) estimate the impact of future credit memos. These deficiencies caused InnerWorkings' reported revenue to be unreliable, as well as its unbilled revenue, inventory and cost of sales. In addition, the Company's internal controls were ineffective in relation to the design and operation of the review controls over compensation, rendering its compensation expenses unreliable. As a result, on July 27, 2018, InnerWorkings revised its financial results for 2015, correcting statements related to revenue and cost of goods sold.

52. On May 10, 2016, InnerWorkings filed a Form 10-Q for the quarter ended March 31, 2016 (the "1Q 2016 10-Q") with the SEC, which provided the Company's first quarter 2016 financial statements and position. The 1Q 2016 10-Q reported in Item 1, the Company's Condensed Consolidated Financial Statements, that its revenue for the three months ended March 31, 2016 was $271,073,000. It reported cost of goods sold as $209,127,000, gross profit as $61,946,000, selling,

general, and administrative expenses as $51,492,000, income from operations as $603,000, a loss before taxes of $621,000, income tax expense of $2,072,000, a net loss of $2,693,000, and a comprehensive loss of $3,163,000. It reported basic and diluted losses of $0.05 per share.

53. The 1Q 2016 10-Q was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that in fact the Company's revenue for the three months ended March 31, 2016 was $270,461,000. Its cost of goods sold was $208,935,000, gross profit was $61,526,000, selling, general, and administrative expenses were $51,477,000, income from operations was $198,000, loss before taxes was $1,026,000, income tax expense was $2,110,000, net loss was $3,136,000, and comprehensive loss was $3,441,000. InnerWorkings' basic and diluted losses were actually $0.06 per share.

54. The 1Q 2016 10-Q also stated that the Company's disclosure controls and procedures were effective as of March 31, 2016, specifically disclosing to investors:

> **Evaluation of Disclosure Controls and Procedures**
>
> Under the supervision and with the participation of our chief executive officer and chief financial officer, we evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2016. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), means controls and

other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of March 31, 2016, our chief executive officer and chief financial officer concluded that, as of such date, the Company's disclosure controls and procedures were effective at the reasonable assurance level.

**Changes in Internal Control Over Financial Reporting**

In the third quarter of 2013, we began the implementation of a new global enterprise resource planning system which includes the implementation of shared service centers in some regions. This multi-year initiative will be conducted in phases and will include modifications to the design and operation of internal controls over financial reporting. We are testing internal controls over financial reporting for design effectiveness prior to implementation of each phase, and we have monitoring controls in place over the implementation of these changes.

> ***Except as described above, there have been no other changes in our internal control over financial reporting (as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) during the quarter ended March 31, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.) The 1Q 2016 10-Q was signed by Defendants Belcher and Pritchett. The 1Q 2016 10-Q contained signed SOX certifications by Defendants Belcher and Pritchett attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

55. This was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that there were material weaknesses in the Company's internal controls due to four primary violations, all of which involved the cost of goods sold being recorded in an incorrected time period: an "error" in a report used to support the reconciliation of accrued accounts payable, improper reporting of revenue recognition for free on board destination contracts, wrongfully recognized revenue for inventory at its warehouses for which customers had paid but that had not been shipped to customers, and the failure to identify revenue from certain customer orders that was earned but not invoiced in 2017 in the financial close process. In fact, the Company's internal controls were inadequate to: (i) ensure revenue was recognized

when the risk of loss transferred from the Company to the customer based on an analysis of customer arrangements and delivery terms, (ii) retain and review customer order documentation, including support for assessing whether pricing was fixed and determinable, and (iii) estimate the impact of future credit memos. These deficiencies caused InnerWorkings' reported revenue to be unreliable, as well as its unbilled revenue, inventory and cost of sales. In addition, the Company's internal controls were ineffective in relation to the design and operation of the review controls over compensation, rendering its compensation expenses unreliable.

56. On August 15, 2016, InnerWorkings filed a Form 10-Q for the quarter ended June 30, 2016 (the "2Q 2016 10-Q") with the SEC, which provided the Company's second quarter 2016 financial statements and position. The 2Q 2016 10-Q reported in Item 1, the Company's Condensed Consolidated Financial Statements, that its revenue for the three months ended June 30, 2016 was $269,220,000. It reported cost of goods sold as $204,126,000, gross profit as $65,093,000, selling, general, and administrative expenses as $51,418,000, income from operations as $1,056,000, income before taxes as $386,000, income tax expense of $2,710,000, a net loss of $2,324,000, and a comprehensive loss of $3,714,000.

57. The 2Q 2016 10-Q was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded

that in fact the Company's revenue for the three months ended June 30, 2016 was $272,212,000. Cost of goods sold was $206,232,000, gross profit was $65,980,000, selling, general, and administrative expenses were $51,622,000, income from operations was $1,739,000, income before taxes was $1,069,000, income tax expense was $2,974,000, the Company's net loss was actually $1,905,000, and its comprehensive loss was actually $3,295,000 according to the Restatement.

58. The 2Q 2016 10-Q disclosed a material weakness in internal controls to investors, specifically stating:

> **Evaluation of Disclosure Controls and Procedures**
>
> Under the supervision and with the participation of our chief executive officer and chief financial officer, we evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2016 (the "Evaluation Date"). Based on this evaluation, our chief executive officer and chief financial officer concluded as of the Evaluation Date that due to the material weakness in our internal control over financial reporting described below, our disclosure controls and procedures were not effective as of the Evaluation Date such that the information relating to the Company, including its consolidated subsidiaries, required to be disclosed in our SEC reports (i) is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (ii) is accumulated and communicated to the Company's management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.
>
> ***Notwithstanding the ineffectiveness of our disclosure controls and procedures as of the Evaluation Date and***

***the material weaknesses in our internal control over financial reporting that existed as of that date as described below, management believes that (i) this Form 10-Q does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the periods covered by this Quarterly Report and (ii) the unaudited consolidated financial statements, and other financial information, included in this Quarterly Report fairly present in all material respects in accordance with generally accepted accounting principles ("GAAP") our financial condition, results of operations and cash flows as of, and for, the dates and periods presented.***

**Material Weakness and Related Remediation Efforts**

During the financial statement close for the period ended June 30, 2016, management identified the following material weakness:

*Material Weakness*

We identified a material weakness in our internal control over financial reporting relating to the recognition of non-executive bonus compensation expense. Specifically, the Company did not have a control within the financial statement close process that is designed to detect the incorrect accounting related to the accrual of non-executive bonus compensation expense.

*Remediation Efforts*

Our management has worked, and continues to work, to strengthen our internal control over financial reporting. We are committed to ensuring that such controls are operating effectively. The Company now will accrue non-executive bonus expense during the course of the relevant service year when the amount is estimable and probable,

which will result in the Company using the same method of accounting for non-executive bonuses as it applies to executive bonuses.

In addition, the Company has initiated a plan to remediate the material weakness noted above by adopting controls within the financial statement close process as follows: (1) implement a process to ensure accounting policies and procedures related to non-executive bonuses are reviewed on a regular basis and updated for any changes in the related bonus plans; (2) analyze and modify checklists and forms to aid in application of the Company's principal accounting policies and procedures related to non-executive bonuses; and (3) implement additional review procedures over the calculation of the non-executive bonus expense to ensure proper application of the accounting policies and procedures and accuracy of the recorded amounts.

We will continue to seek to actively identify, develop and implement additional measures designed to materially improve and strengthen our internal control over financial reporting.

**Changes in Internal Control Over Financial Reporting**

In the third quarter of 2013, we began the implementation of a new global enterprise resource planning system which includes the implementation of shared service centers in some regions. This multi-year initiative will be conducted in phases and will include modifications to the design and operation of internal controls over financial reporting. We are testing internal controls over financial reporting for design effectiveness prior to implementation of each phase, and we have monitoring controls in place over the implementation of these changes.

***Except as described above, there have been no other changes in our internal control over financial reporting***

> ***(as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) during the quarter ended June 30, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.) The 2Q 2016 10-Q was signed by Defendants Belcher and Pritchett. The 2Q 2016 10-Q contained signed SOX certifications by Defendants Belcher and Pritchett attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

59. This disclosure was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that there were other material weaknesses in the Company's internal controls due to four primary violations, all of which involved the cost of goods sold being recorded in an incorrected time period: an "error" in a report used to support the reconciliation of accrued accounts payable, improper reporting of revenue recognition for free on board destination contracts, wrongfully recognized revenue for inventory at its warehouses for which customers had paid but that had not been shipped to customers, and the failure to identify revenue from certain customer orders that was earned but not invoiced in 2017 in the financial close process. In fact, at this time, the Company's internal controls were inadequate to: (i) ensure revenue was recognized when the risk of loss transferred from the Company to the

customer based on an analysis of customer arrangements and delivery terms, (ii) retain and review customer order documentation, including support for assessing whether pricing was fixed and determinable, and (iii) estimate the impact of future credit memos. These deficiencies caused InnerWorkings' reported revenue to be unreliable, as well as its unbilled revenue, inventory and cost of sales. In addition, the Company's internal controls were ineffective in relation to the design and operation of the review controls over compensation, rendering its compensation expenses unreliable.

60. On November 6, 2016, InnerWorkings filed a Form 10-Q for the quarter ended September 30, 2016 (the "3Q 2016 10-Q") with the SEC, which provided the Company's third quarter 2016 financial statements and position. The 3Q 2016 10-Q reported in Item 1, the Company's Condensed Consolidated Financial Statements, that its revenue for the three months ended September 30, 2016 was $279,993,000. It reported cost of goods sold as $212,212,000, gross profit as $67,781,000, selling, general, and administrative expenses as $52,601,000, income from operations as $8,860,000, income before taxes as $7,581,000, income tax expense of $3,240,000, net income of $4,341,000, and comprehensive income of $4,140,000.

61. The 3Q 2016 10-Q was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded

that in fact the Company's revenue for the three months ended September 30, 2016 was $276,002,000. Cost of goods sold was $209,421,000, gross profit was $66,581,000, selling, general, and administrative expenses were $52,466,000, income from operations was $7,796,000, income before taxes was $6,517,000, income tax expense was $2,292,000, net income was actually $4,225,000, and comprehensive income was actually $4,024,000 according to the Restatement.

62. The 3Q 2016 10-Q disclosed again the weakness disclosed in the previous quarter in InnerWorkings' internal control over financial reporting relating to the recognition of non-executive bonus compensation expense, stating:

> **Evaluation of Disclosure Controls and Procedures**
>
> Under the supervision and with the participation of our chief executive officer and chief financial officer, we evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2016 (the "Evaluation Date"). Based on this evaluation, our chief executive officer and chief financial officer concluded as of the Evaluation Date that due to the material weakness in our internal control over financial reporting described below, our disclosure controls and procedures were not effective as of the Evaluation Date such that the information relating to the Company, including its consolidated subsidiaries, required to be disclosed in our SEC reports (i) is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (ii) is accumulated and communicated to the Company's management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

***Notwithstanding the ineffectiveness of our disclosure controls and procedures as of the Evaluation Date and the material weaknesses in our internal control over financial reporting that existed as of that date as described below, management believes that (i) this Form 10-Q does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the periods covered by this Quarterly Report and (ii) the unaudited consolidated financial statements, and other financial information, included in this Quarterly Report fairly present in all material respects in accordance with generally accepted accounting principles ("GAAP") our financial condition, results of operations and cash flows as of, and for, the dates and periods presented.***

**Material Weakness and Related Remediation Efforts**

As previously disclosed, during the financial statement close for the period ended June 30, 2016, management identified the following material weakness:

*Material Weakness*

We identified a material weakness in our internal control over financial reporting relating to the recognition of non-executive bonus compensation expense. Specifically, the Company did not have a control within the financial statement close process that is designed to detect the incorrect accounting related to the accrual of non-executive bonus compensation expense.

*Remediation Efforts*

Our management has worked, and continues to work, to strengthen our internal control over financial reporting. We are committed to ensuring that such controls are operating effectively. The Company is now accruing non-

executive bonus expense during the course of the relevant service year when the amount is estimable and probable, which results in the Company using the same method of accounting for non-executive bonuses as it applies to executive bonuses.

In addition, the Company has initiated a plan to remediate the material weakness noted above by adopting controls within the financial statement close process as follows: (1) implement a process to ensure accounting policies and procedures related to non-executive bonuses are reviewed on a regular basis and updated for any changes in the related bonus plans; (2) analyze and modify checklists and forms to aid in application of the Company's principal accounting policies and procedures related to non-executive bonuses; and (3) implement additional review procedures over the calculation of the non-executive bonus expense to ensure proper application of the accounting policies and procedures and accuracy of the recorded amounts.

We will continue to seek to actively identify, develop and implement additional measures designed to materially improve and strengthen our internal control over financial reporting.

**Changes in Internal Control Over Financial Reporting**

We continue to implement a new global enterprise resource planning system which includes the implementation of shared service centers in some regions. This multi-year initiative will be conducted in phases and will include modifications to the design and operation of internal controls over financial reporting. We are testing internal controls over financial reporting for design effectiveness prior to implementation of each phase, and we have monitoring controls in place over the implementation of these changes.

> ***Except as described above, there have been no other changes in our internal control over financial reporting (as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) during the quarter ended September 30, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.) The 3Q 2016 10-Q was signed by Defendants Belcher and Pritchett. The 3Q 2016 10-Q contained signed SOX certifications by Defendants Belcher and Pritchett attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

63. This was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that there were other material weaknesses in the Company's internal controls due to four primary violations, all of which involved the cost of goods sold being recorded in an incorrected time period: an "error" in a report used to support the reconciliation of accrued accounts payable, improper reporting of revenue recognition for free on board destination contracts, wrongfully recognized revenue for inventory at its warehouses for which customers had paid but that had not been shipped to customers, and the failure to identify revenue from certain customer orders that was earned but not invoiced in 2017 in the financial close process. In fact, at this time, the Company's internal controls were inadequate to: (i) ensure revenue was

recognized when the risk of loss transferred from the Company to the customer based on an analysis of customer arrangements and delivery terms, (ii) retain and review customer order documentation, including support for assessing whether pricing was fixed and determinable, and (iii) estimate the impact of future credit memos. These deficiencies caused InnerWorkings' reported revenue to be unreliable, as well as its unbilled revenue, inventory and cost of sales. In addition, the Company's internal controls were ineffective in relation to the design and operation of the review controls over compensation, rendering its compensation expenses unreliable.

64. On March 9, 2017, InnerWorkings filed an annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's annual financial statements and position.

65. The 2016 10-K reported its revenue for the year as $1,090,704,000, cost of goods sold as $827,156,000, gross profit as $263,548,000, selling, general, and administrative expenses as $209,967,000, income from operations as $19,563,000, income before taxes as $15,325,000, income tax expense as $10,955,000, net income as $4,370,000, basic earnings per share as $0.08, and diluted earnings per share as $0.08. It also reported accounts receivable as of December 31, 2016 as $182,874,000, unbilled revenue as $32,723,000, inventories as $31,638,000, prepaid expenses as $18,772,000, other current assets as

$24,769,000, total current assets as $321,700,000, other non-current assets as $1,374,000, total intangibles and other assets as $236,642,000, total assets as $590,999,000, accounts payable as $121,289,000, accrued expenses as $30,068,000, other current liabilities as $22,971,000, deferred revenue as $12,078,000, total current liabilities as $205,688,000, deferred income taxes as $11,291,000, other long-term liabilities as $1,926,000, and total liabilities as $326,373,000.

66. The 2016 10-K was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that it misstated the Company's financial results. According to the Restatement, the Company's revenue for the year was actually $1,094,402,000, cost of goods sold was $831,838,000, gross profit was $262,564,000, selling, general, and administrative expenses were $209,524,000, income from operations was $19,022,000, income before taxes was $14,783,000, income tax expense was $10,834,000, net income was $3,949,000, basic earnings per share were $0.07, and diluted earnings per share were $0.07. Accounts receivable as of December 31, 2016 were $182,464,000, unbilled revenue was $31,516,000, inventories were $36,448,000, prepaid expenses were $18,459,000, other current assets were $24,597,000, total current assets were $324,408,000, other non-current assets were $1,654,000, total intangibles and other assets were $236,923,000, total assets were

$593,987,000, accounts payable were $123,012,000, accrued expenses were $29,755,000, other current liabilities were $22,576,000, deferred revenue was $16,402,000, total current liabilities were $211,028,000, deferred income taxes were $10,766,000, other long-term liabilities were $2,564,000, and total liabilities were $331,826,000.

67. In the 2016 10-K, Defendants also told investors they could reasonably rely on the Company's internal controls:

> Management assessed the design and effectiveness of the Company's internal control over financial reporting as of December 31, 2016. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control—Integrated Framework* (2013 framework). Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2016 based on criteria in *Internal Control –Integrated Framework* issued by the COSO.
>
> ….
>
> **Evaluation of Disclosure Controls and Procedures**
>
> Under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2016. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed,

summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of December 31, 2016, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, the Company's disclosure controls and procedures were effective at the reasonable assurance level.

**Management’s Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Our internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the consolidated financial statements for external purposes in accordance with generally accepted accounting principles.

Management assessed the design and effectiveness of the Company’s internal control over financial reporting as of December 31, 2016. In making this assessment, management used the criteria set forth by the Committee

of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework (2013 framework). Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2016 based on criteria in Internal Control -Integrated Framework issued by the COSO.

….

**Changes in Internal Control Over Financial Reporting**

During the year ended December 31, 2016, the Company redesigned its review controls to address a previously disclosed material weakness in our internal control over financial reporting identified during the second quarter of 2016 relating to the recognition of non-executive bonus compensation expense. Specifically, the Company previously did not have a control within the financial statement close process that was designed to detect the incorrect accounting related to the accrual of non-executive bonus compensation expense. Our remediation included the following: (1) implementation of a process to ensure accounting policies and procedures related to non-executive bonuses are reviewed on a regular basis and updated for any changes in the related bonus plans; (2) modification of checklists and forms to aid in application of the Company's principal accounting policies and procedures related to non-executive bonuses; and (3) implementation of additional review procedures over the calculation of the non-executive bonus expense to ensure proper application of the accounting policies and procedures and accuracy of the recorded amounts. ***After completing the testing of the design and operating effectiveness of these internal controls, management concluded that we have remediated the previously identified material weakness as of December 31, 2016.***

> In addition, we continue to implement a new global enterprise resource planning system which includes the implementation of shared service centers in some regions. This multi-year initiative will be conducted in phases and will include modifications to the design and operation of internal controls over financial reporting. We are testing internal controls over financial reporting for design effectiveness prior to implementation of each phase and we have monitoring controls in place over the implementation of these changes.
>
> ***Except as described above, there have been no other changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended December 31, 2016 that have materially affected or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.) The 2016 10-K was signed by Defendants Belcher and Pritchett. The 2016 10-K contained signed SOX certifications by Defendants Belcher and Pritchett attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

68. This was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that there continued to be un-remediated material weaknesses in the Company's internal controls. These material weaknesses in the Company's internal controls were due to four primary violations, all of which involved the cost of goods sold being

recorded in an incorrected time period: an "error" in a report used to support the reconciliation of accrued accounts payable, improper reporting of revenue recognition for free on board destination contracts, wrongfully recognized revenue for inventory at its warehouses for which customers had paid but that had not been shipped to customers, and the failure to identify revenue from certain customer orders that was earned but not invoiced in 2017 in the financial close process. At this time, the Company's internal controls were inadequate to: (i) ensure revenue was recognized when the risk of loss transferred from the Company to the customer based on an analysis of customer arrangements and delivery terms, (ii) retain and review customer order documentation, including support for assessing whether pricing was fixed and determinable, and (iii) estimate the impact of future credit memos. These deficiencies caused InnerWorkings' reported revenue to be unreliable, as well as its unbilled revenue, inventory and cost of sales. In addition, the Company's internal controls were ineffective in relation to the design and operation of the review controls over compensation, rendering its compensation expenses unreliable.

69. On May 8, 2017, InnerWorkings filed a Form 10-Q for the quarter ended March 31, 2017 (the "1Q 2017 10-Q") with the SEC, which provided the Company's first quarter 2017 financial statements and position. The 1Q 2017 10-Q reported that InnerWorkings' revenue for the three months ended March 31, 2017

was $267,390,000. It reported cost of goods sold as $203,113,000, gross profit as $64,227,000, selling, general, and administrative expenses as $53,427,000, income from operations as $8,986,000, income before taxes of $7,793,000, income tax expense of $2,337,000, net income of $5,456,000, basic earnings per share of $0.10, and comprehensive income of $7,435,000.

70. The 1Q 2017 10-Q was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that in fact the Company's revenue for the three months ended March 31, 2017 was $264,405,000. Its cost of goods sold was $199,701,000, gross profit was $64,704,000, selling, general, and administrative expenses were $53,615,000, income from operations was $9,225,000, income before taxes was $8,032,000, income tax expense was $2,354,000, net income was $5,678,000, basic earnings per share were $0.11, and and comprehensive income was $7,657,000.

71. The 1Q 2017 10-Q also stated that the Company's disclosure controls and procedures were effective as of March 31, 2017, specifically telling investors:

> **Evaluation of Disclosure Controls and Procedures**
>
> Under the supervision and with the participation of our chief executive officer and chief financial officer, we evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2017. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), means controls and

other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of March 31, 2017, our chief executive officer and chief financial officer concluded that, as of such date, the Company's disclosure controls and procedures were effective at the reasonable assurance level.

**Changes in Internal Control Over Financial Reporting**

We continue to implement a new global enterprise resource planning system which includes the implementation of shared service centers in some regions and, beginning in January 2017, includes a cloud-based consolidation and reporting tool. This multi-year initiative will be conducted in phases and will include modifications to the design and operation of internal controls over financial reporting. We are testing internal controls over financial reporting for design effectiveness prior to implementation of each phase, and we have

> monitoring controls in place over the implementation of these changes.
>
> ***Except as described above, there have been no other changes in our internal control over financial reporting (as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) during the quarter ended March 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.) The 1Q 2017 10-Q was signed by Defendants Belcher and Pritchett. The 1Q 2017 10-Q contained signed SOX certifications by Defendants Belcher and Pritchett attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

72. This was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that there continued to be unremediated material weaknesses in the Company's internal controls. These material weaknesses in the Company's internal controls were due to four primary violations, all of which involved the cost of goods sold being recorded in an incorrected time period: an "error" in a report used to support the reconciliation of accrued accounts payable, improper reporting of revenue recognition for free on board destination contracts, wrongfully recognized revenue for inventory at its warehouses for which customers had paid but that had not been

shipped to customers, and the failure to identify revenue from certain customer orders that was earned but not invoiced in 2017 in the financial close process. At this time, the Company's internal controls were inadequate to: (i) ensure revenue was recognized when the risk of loss transferred from the Company to the customer based on an analysis of customer arrangements and delivery terms, (ii) retain and review customer order documentation, including support for assessing whether pricing was fixed and determinable, and (iii) estimate the impact of future credit memos. These deficiencies caused InnerWorkings' reported revenue to be unreliable, as well as its unbilled revenue, inventory and cost of sales. In addition, the Company's internal controls were ineffective in relation to the design and operation of the review controls over compensation, rendering its compensation expenses unreliable.

73. On August 7, 2017, InnerWorkings filed a Form 10-Q for the quarter ended June 30, 2017 (the "2Q 2017 10-Q") with the SEC, which provided the Company's second quarter 2017 financial statements and position. The 2Q 2017 10-Q reported that InnerWorkings' revenue for the three months ended June 30, 2017 was $279,530,000. It reported cost of goods sold as $209,303,000, gross profit as $70,227,000, selling, general, and administrative expenses as $55,086,000, income from operations as $10,075,000, income before taxes of $7,884,000, income

tax expense of $3,391,000, net income of $4,493,000, and comprehensive income of $8,373,000.

74. The 2Q 2017 10-Q was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that in fact the Company's revenue for the three months ended June 30, 2017 was $280,066,000. Its cost of goods sold was $210,020,000, gross profit was $70,046,000, selling, general, and administrative expenses were $55,054,000, income from operations was $9,926,000, income before taxes was $7,736,000, income tax expense was $3,362,000, net income was $4,374,000, and comprehensive income was $8,253,000.

75. The 2Q 2017 10-Q also stated that the Company's disclosure controls and procedures were effective as of June 30, 2017, specifically stating:

> **Evaluation of Disclosure Controls and Procedures**
>
> Under the supervision and with the participation of our chief executive officer and chief financial officer, we evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2017. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without

limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of June 30, 2017, our chief executive officer and chief financial officer concluded that, as of such date, the Company's disclosure controls and procedures were effective at the reasonable assurance level.

**Changes in Internal Control Over Financial Reporting**

We continue to implement a new global enterprise resource planning system which includes the implementation of shared service centers in some regions and, beginning in January 2017, includes a cloud-based consolidation and reporting tool. This multi-year initiative will be conducted in phases and will include modifications to the design and operation of internal controls over financial reporting. We are testing internal controls over financial reporting for design effectiveness prior to implementation of each phase, and we have monitoring controls in place over the implementation of these changes.

***Except as described above, there have been no other changes in our internal control over financial reporting (as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) during the quarter***

> ***ended June 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.) The 2Q 2017 10-Q was signed by Defendants Belcher and Pritchett. The 2Q 2017 10-Q contained signed SOX certifications by Defendants Belcher and Pritchett attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

76. This was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that there continued to be un-remediated material weaknesses in the Company's internal controls. These material weaknesses in the Company's internal controls were due to four primary violations, all of which involved the cost of goods sold being recorded in an incorrected time period: an "error" in a report used to support the reconciliation of accrued accounts payable, improper reporting of revenue recognition for free on board destination contracts, wrongfully recognized revenue for inventory at its warehouses for which customers had paid but that had not been shipped to customers, and the failure to identify revenue from certain customer orders that was earned but not invoiced in 2017 in the financial close process. At this time, the Company's internal controls were inadequate to: (i) ensure revenue was recognized when the risk of loss transferred from the Company to the customer

based on an analysis of customer arrangements and delivery terms, (ii) retain and review customer order documentation, including support for assessing whether pricing was fixed and determinable, and (iii) estimate the impact of future credit memos. These deficiencies caused InnerWorkings' reported revenue to be unreliable, as well as its unbilled revenue, inventory and cost of sales. In addition, the Company's internal controls were ineffective in relation to the design and operation of the review controls over compensation, rendering its compensation expenses unreliable.

77. On November 7, 2017, InnerWorkings filed a Form 10-Q for the quarter ended September 30, 2017 (the "3Q 2017 10-Q") with the SEC, which provided the Company's third quarter 2017 financial statements and position. The 3Q 2017 10-Q reported that InnerWorkings' revenue for the three months ended September 30, 2017 was $288,386,000. It reported cost of goods sold as $215,867,000, gross profit as $72,519,000, selling, general, and administrative expenses as $57,134,000, income from operations as $12,236,000, income before taxes of $11,495,000, income tax expense of $3,967,000, net income of $7,528,000, comprehensive income of $9,696,000, basic earnings per share of $0.14, and diluted earnings per share of $0.14.

78. The 3Q 2017 10-Q was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded

that in fact the Company's revenue for the three months ended September 30, 2017 was $288,523,000. Its cost of goods sold was $216,602,000, gross profit was $71,921,000, selling, general, and administrative expenses were $57,186,000, income from operations was $11,585,000, income before taxes was $10,844,000, income tax expense was $3,728,000, net income was $7,116,000, comprehensive income was $9,284,000, basic earnings per share was $0.13, and diluted earnings per share was $0.13.

79. The 3Q 2017 10-Q also stated that the Company's disclosure controls and procedures were effective as of September 30, 2017, specifically stating:

> **Evaluation of Disclosure Controls and Procedures**
>
> Under the supervision and with the participation of our chief executive officer and chief financial officer, we evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2017. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and

principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of September 30, 2017, our chief executive officer and chief financial officer concluded that, as of such date, the Company's disclosure controls and procedures were effective at the reasonable assurance level.

**Changes in Internal Control Over Financial Reporting**

We continue to implement a new global enterprise resource planning system which includes the implementation of shared service centers in some regions and, beginning in January 2017, includes a cloud-based consolidation and reporting tool. This multi-year initiative will be conducted in phases and will include modifications to the design and operation of internal controls over financial reporting. We are testing internal controls over financial reporting for design effectiveness prior to implementation of each phase, and we have monitoring controls in place over the implementation of these changes.

***Except as described above, there have been no other changes in our internal control over financial reporting (as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) during the quarter ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.) The 3Q 2017 10-Q was signed by Defendants Belcher and Pritchett. The 3Q 2017 10-Q contained signed SOX certifications by Defendants Belcher and Pritchett attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

80. This was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that there continued to be unremediated material weaknesses in the Company's internal controls. These material weaknesses in the Company's internal controls were due to four primary violations, all of which involved the cost of goods sold being recorded in an incorrected time period: an "error" in a report used to support the reconciliation of accrued accounts payable, improper reporting of revenue recognition for free on board destination contracts, wrongfully recognized revenue for inventory at its warehouses for which customers had paid but that had not been shipped to customers, and the failure to identify revenue from certain customer orders that was earned but not invoiced in 2017 in the financial close process. At this time, the Company's internal controls were inadequate to: (i) ensure revenue was recognized when the risk of loss transferred from the Company to the customer based on an analysis of customer arrangements and delivery terms, (ii) retain and review customer order documentation, including support for assessing whether

pricing was fixed and determinable, and (iii) estimate the impact of future credit memos. These deficiencies caused InnerWorkings' reported revenue to be unreliable, as well as its unbilled revenue, inventory and cost of sales. In addition, the Company's internal controls were ineffective in relation to the design and operation of the review controls over compensation, rendering its compensation expenses unreliable.

## VI. THE TRUTH BEGINS TO EMERGE, AS DEFENDANTS CONTINUE TO MAKE FALSE STATEMENTS

81. On December 6, 2017, InnerWorkings announced Pritchett's resignation, effective immediately, "due to personal matters inconsistent with Company policy." A Former Employee ("FE"), a finance employee who reported directly to Pritchett, explained that at the time of Pritchett's departure, the finance function was in turmoil, with a lack of process and responsibilities around the time of Pritchett's departure. Defendant Hodgkins immediately took on the role of interim CFO.

82. On February 1, 2018, InnerWorkings announced that Belcher would transition to a role as the Company's Executive Chairman of the Board of Directors. The Company announced that he would be succeeded by Rich Stoddart, effective April 5, 2018.

83. On February 26, 2018, InnerWorkings issued a press release announcing that it was rescheduling its fourth quarter and full year 2017 earnings release and conference call to allow additional time to complete the Company's 2017 financial close and audit, and releasing select preliminary and unaudited fourth quarter 2017 and full-year 2017 results.

84. On March 12, 2018, InnerWorkings announced its fourth quarter and full year 2017 results in a press release and held an earnings call in advance of filing its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the “2017 10-K”) with the SEC.

85. On the March 12, 2018 earnings call, Defendants disclosed a material weakness in the Company’s internal controls over financial reporting. Defendant Hodgkins explained that, during the process of implementing new revenue recognition standards that went into effect for 2018, InnerWorkings concluded that it had a material weakness in internal controls over financial reporting as of December 31, 2017. He reassured investors, however, that “[t]his, of course, won't impact our current or previously reported financials which remain correct, as stated.”

86. Defendant Hodgkins’ statement was false and misleading because he knew or recklessly disregarded that, in fact, the material weakness in

InnerWorkings' internal controls over financial reporting impacted both current and previously reported financial results, going back to the Company's 2Q 2015 10-Q.

87. On this news, InnerWorkings' stock dropped over 5.5%, falling from a closing price of $9.66 per share on March 12, 2018 to close at $9.13 per share on March 13, 2018.

88. On March 16, 2018, InnerWorkings filed an annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K") with the SEC, which provided the Company's annual financial statements and position – the first disclosure of financial results since Pritchett's departure. The 2017 10-K reported InnerWorkings' revenue for the year as $1,136,256,000, cost of goods sold as $857,921,000, gross profit as $278,335,000, selling, general, and administrative expenses as $225,738,000, income from operations as $38,530,000, income before taxes as $32,110,000, income tax expense as $13,131,000, net income as $18,979,000, basic earnings per share as $0.35, and diluted earnings per share as $0.35. It also reported accounts receivable as of December 31, 2017 as $206,712,000, unbilled revenue as $49,389,000, inventories as $34,807,000, prepaid expenses as $19,638,000, other current assets as $32,694,000, total current assets as $373,802,000, other non-current assets as $1,382,000, total intangibles and other assets as $229,503,000, total assets as $640,019,000, accounts payable as $134,609,000, accrued expenses as $33,694,000, other current liabilities as

$20,956,000, deferred revenue as $13,685,000, total current liabilities as $202,943,000, deferred income taxes as $12,348,000, other long-term liabilities as $6,771,000, and total liabilities as $350,461,000.

89. The 2017 10-K was materially false and misleading because Defendants InnerWorkings, Belcher, and Pritchett knew or recklessly disregarded that it misstated the Company's financial results. According to the Restatement, the Company's revenue for the year was actually $1,138,361,000, cost of goods sold was $862,903,000, gross profit was $275,548,000, selling, general, and administrative expenses were $227,253,000, income from operations was $34,138,000, income before taxes was $27,718,000, income tax expense was $11,288,000, net income was $16,430, basic earnings per share were $0.31, and diluted earnings per share were $0.30. Accounts receivable as of December 31, 2017 were $205,386,000, unbilled revenue was $50,016,000, inventories were $40,694,000, prepaid expenses were $18,565,000, other current assets were $37,865,000, total current assets were $383,088,000, other non-current assets were $691,000, total intangibles and other assets were $229,836,000, total assets were $646,638,000, accounts payable were $141,164,000, accrued expenses were $34,391,000, other current liabilities were $24,078,000, deferred revenue was $17,620,000, total current liabilities were $217,253,000, deferred income taxes

were $12,043,000, other long-term liabilities were $7,399,000, and total liabilities were $365,093,000.

90. In the 2017 10-K, Defendants also disclosed the material weaknesses in the Company's internal controls that they had discussed on the March 12, 2018 earnings call, specifically stating:

> Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2017. The framework used in carrying out our evaluation was the 2013 Internal Control - Integrated Framework published by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission. In evaluating our information technology controls, we also used components of the framework contained in the Control Objectives for Information and related Technology ("COBIT"), which was developed by the Information Systems Audit and Control Association's IT Governance Institute, as a complement to the COSO internal control framework. Based on this evaluation, our management identified control deficiencies as of December 31, 2017 which constituted material weaknesses.
>
> A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of a company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis.
>
> As a result of the material weakness noted above and described below, management has concluded that we did not maintain effective internal control over financial reporting as of December 31, 2017.

> **Material Weaknesses and Related Remediation Efforts**
>
> During the financial statement close process for the period ended December 31, 2017, management identified the following material weaknesses in internal control.
>
> Material Weaknesses
>
> The material weaknesses are due to control deficiencies and gaps in the design and operating effectiveness of revenue recognition and compensation expense controls in the Company's North America business.
>
> With respect to revenue process, the Company's controls were ineffective to: (i) ensure revenue was recognized when the risk of loss transferred from the Company to the customer based on an analysis of customer arrangements and delivery terms, (ii) retain and review customer order documentation, including support for assessing whether pricing was fixed and determinable, and (iii) estimate the impact of future credit memos. These deficiencies also impacted unbilled revenue, inventory and cost of sales. With respect to compensation expense, the Company's controls were ineffective in relation to the design and operation of the review controls over compensation.
>
> Remediation Efforts
>
> Our management has worked, and continues to work, to strengthen our internal control over financial reporting. We are committed to ensuring that such controls are operating effectively.
>
> The Company has initiated a plan to remediate the material weaknesses noted above. Specifically, to remediate deficiencies in revenue recognition controls, the Company will develop and implement controls to (i) compile and process shipping data and delivery terms in customer contracts and improve related operational

> processes; (ii) improve review processes and related documentation supporting customer orders and pricing; (iii) improve process for estimating future credit memos; and (iv) implement an improved system, process, and related controls to categorize and track customer contracts based on delivery terms. To remediate deficiencies in the controls over the compensation process, the Company will develop and implement controls to ensure that systems used for computing payroll, commission, and bonus expenses are updated with accurate data to reflect approved compensation arrangements. Additionally, the Company will develop and implement controls over the accuracy and completeness of information used in the controls, such as validation of source data, report logic, and report parameters.
>
> We will continue to actively identify, develop, and implement additional measures to materially improve and strengthen our internal control over financial reporting.
>
> **Changes in Internal Control Over Financial Reporting**
>
> Other than the changes described above, there have been no other changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

The 2017 10-K was signed by Defendants Belcher and Hodgkins. The 2017 10-K contained signed SOX certifications by Defendants Belcher and Hodgkins attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

91. This was materially false and misleading because Defendants InnerWorkings, Belcher, and Hodgkins knew or recklessly disregarded that the internal control weaknesses that it disclosed had, in fact, caused the Company to materially misstate its financial results.

## VII. THE TRUTH EMERGES

92. On May 7, 2018, after the market closed, InnerWorkings issued a press release entitled, "InnerWorkings Postpones Release of First Quarter 2018 Financial Results." The press release finally disclosed that many of the Company's historical financial statements contained errors which required restatement, stating in relevant part:

> CHICAGO, IL – May 7, 2018 – InnerWorkings, Inc. (NASDAQ: INWK), the leading global marketing execution firm, announced that it is postponing the release of its first quarter 2018 financial results and conference call due to ***errors in its historical financial statements identified during the course of its first quarter financial reporting close process. The Company will be restating its financial statements for the years ended December 31, 2017, 2016, and 2015, and all interim periods within those years.***
>
> ***The accounting errors relate primarily to recording a portion of costs of goods sold in the wrong period***, and have no material impact on InnerWorkings' cash flow, revenue, or liquidity. The restated financial statements will also correct other errors identified during prior periods, which were immaterial individually and in the aggregate. Based on its preliminary assessment,

> InnerWorkings estimates the aggregate impact of these corrections on income before income taxes as follows:
>
> - For the year ended December 31, 2017, a decrease in income before income taxes of $2.5 - $4.5 million;
> - For the year ended December 31, 2016, a decrease in income before income taxes of $1.5 - $2.5 million; and;
> - For the year ended December 31, 2015, an increase in income before income taxes of $0.5 - $1.5 million.
>
> In order to allow sufficient time to complete its review and corrections to the historical financial statements, InnerWorkings is delaying reporting first quarter 2018 financial results and hosting its conference call, originally scheduled for May 8, 2018. The Company expects to file an amendment to its 2017 Form 10-K reflecting the corrected financial statements and reschedule its first quarter 2018 earnings release and conference call to no later than May 31, 2018. For more information about the restatement, please see the Company's Current Report on Form 8-K (Item 4.02) filed on May 7, 2018.

(Emphasis added).

93. On this news, the Company's shares fell $0.62 per share or over 6.4% to close at $9.06 per share on May 8, 2018, damaging investors.

94. Defendants admitted that these financial results contained material misstatements requiring restatement, meaning that they were not prepared in conformity with GAAP.[3]

---

[3] *See* SEC Staff Accounting Bulletins, Topic 1.M., Assessing Materiality, explaining that a "misstatement" or "omission" in the context of a materiality

95. On May 11, 2018, InnerWorkings filed a notification of inability to timely file Form 10-Q or 10-QSB on Form NT 10-Q with the SEC, stating that it was in the process of restating its financial statements for the years ended December 31, 2017, 2016, and 2015, and all interim periods within those years.

96. On May 16, 2018, InnerWorkings received a customary notification letter from NASDAQ stating that, as a result of not having timely filed its Form 10-Q for the quarter ended March 31, 2018, it was not in compliance with NASDAQ Listing Rule 5250(c)(1), which requires timely filing of periodic financial reports with the SEC.

97. On May 29, 2018, InnerWorkings announced that it was postponing its 2018 annual meeting of stockholders, which was originally scheduled to be held on May 31, 2018, due to the restatement process.

98. The Company did not file an amended 2017 10-K by May 31, 2018. On June 28, 2018, however, InnerWorkings announced that its 2018 annual meeting of stockholders would be rescheduled for September 6, 2018. In a press release, the Company stated that it now expected to complete the restatement during July 2018. On July 27, 2018, InnerWorkings filed the Restatement with the SEC, finally

---

analysis "refers to a financial statement assertion that would not be in conformity with GAAP."

disclosing to investors the extent of the effect of its internal control weaknesses on its financial disclosures since the second quarter of 2015.

99. On a conference call with investors held on March 31, 2018, Hodgkins explained:

> While completing our Q1 2018 financial statements, we became aware of a few specific instances where cost of goods sold were recorded in a wrong period. These are unfortunate errors resulting from the manual processes in our accounting and operations functions in which we are investing to fix.
>
> This timing error affected a half of a percent of our approximately $850 million in annual cost of goods sold, but because the amount is material to our pre-tax income, we have the obligation to restate our results to reflect the accurate timing.
>
> Last quarter, you may recall that we had a material weakness in revenue recognition. That was a real wake up call, which prompted us to launch several initiatives to improve our accounting processes and the way we interact with our operating teams.
>
> While the discovery of these errors was unrelated to the revenue recognition challenges, they both evidence a larger issue reinforcing the importance of the initiatives already implied being able to efficiently and accurately report financial statements is the price of admission for a publicly traded company and we take these errors very seriously.
>
> To help bolster these improvement initiatives, we are excited to announce that we have hired a Chief Accounting Officer, John Bossard.
>
> ….

> Relating to this, the discovery of these errors also conveys that our profitability in 2017 was weaker than we had originally reported though consistent with the range we've recently disclosed. This realization, combined with our disappointing first quarter profit performance prompted us to conduct a thorough review of the way we operate and we are planning all steps to improve it as Rich explained.

100. Hodgkins' explanation corroborated FE's account of a finance department in turmoil, with a lack of effective processes. It did not, however, make sense in the context of the Restatement, which stated that the primary "errors" that it corrected ***were revenue recognition problems, including ones relating to inventory***. Specifically, the Restatement identified four primary violations. The Restatement corrected a report Defendants used to support the reconciliation of accrued accounts payable, corrected the Company's revenue recognition for free on board destination contracts, admitted that the Company had wrongfully recognized revenue for inventory for which customers had paid that remained at its warehouses, and disclosed that InnerWorkings had neglected to identify earned revenue from certain customer orders that it had not invoiced in 2017 in the financial close process for the year.

101. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities Plaintiff and other Class members have suffered significant losses and damages.

## VIII. DEFENDANTS' GAAP VIOLATIONS

102. The Company represented its financial results and statements in a manner which materially violated GAAP, including the following fundamental accounting principles:

a. The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

b. The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

c. The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibility for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

d. The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

e. The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

f. The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions, was violated (FASB Statement of Concepts No. 2, ¶79); and

g. The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid

injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2 ¶¶95, 97).

103. InnerWorkings's financial statements were not in compliance with GAAP in several areas, including the timing of revenue recognition for FOB destination contracts and customer-owned inventory. In its July 27, 2018 Form 10-K/A for the year ended December 31, 2017, Defendants admitted that InnerWorkings's previously filed financial statements were not in compliance with GAAP. Through its restatement, InnerWorkings acknowledged that its annual financial statements for 2016 and 2017 and all interim periods therein were materially false when issued.

104. With respect to InnerWorkings's recognition for revenue for FOB destination contracts, ASC Topic 605 governs and that GAAP is prescriptive. That is, for all intents and purposes ASC Topic 605 requires application of specific rules and no application of judgment.

105. With respect to revenue, the Company stated in the 2016 10-K:

> Our revenue consists of the prices paid to us by our clients for marketing materials. These prices, in turn, reflect the amounts charged to us by our suppliers plus our gross profit. Our gross profit margin, in the case of some of our enterprise clients, is fixed by contract or, in the case of transactional clients, is dependent on prices negotiated on a job-by-job basis. Once either type of client accepts our pricing terms, the selling price is established and we procure the product for our own account in order to re-

> sell it to the client. We generally take full title and risk of loss for the product upon shipment. ***The finished product is typically shipped directly from our supplier to a destination specified by our client*. *Upon shipment, our supplier invoices us for its production costs and we invoice our client*.**

106. FOB destination means "free on board destination." The term means that InnerWorkings's customers take delivery of products the Company ships to them when the products arrive at the customers' location. InnerWorkings pays and bears the freight charges and owns the products while they are in transit. The FOB Destination contracts in question specified terms, indicating that InnerWorkings maintained the risk of loss on the products it sells until they arrive at the customers' location. Whether enterprise or transactional client, the contracts in question specify that the products are FOB destination. If the contract in question specified FOB destination, then GAAP required InnerWorkings to avoid recognizing revenue until the risk of loss passed to the customer.

107. Topic 606-10-25-23 mandates that "an entity shall recognize revenue when or as the entity satisfies a performance obligation by transferring a promised good or service to a customer. An asset is transferred when or as the customer takes control of that asset." This prescriptive GAAP mandated that InnerWorkings not recognize revenue until risk to the product shifted to its customers. With full knowledge of the terms of its own contracts and the prescriptive GAAP prohibiting

it from recognizing revenue until its products arrived at the customer's location, Defendants disregarded its reporting obligations by prematurely recognizing revenue. As a result, the error described herein is not a change in historic assumption, estimate or judgment and can only be based upon a deliberate act or a reckless disregard of GAAP in applying this prescriptive test as to when the Company should have recognized revenue.

108. Similarly, Defendants' own revenue recognition policy requires that for it to recognize revenue, its customers must "take[] title and assume[] the risks and rewards of ownership." The Company, however, warehouses certain products for its customers, storing product at its warehouses until the customer requests delivery at a particular location. Because this the customers who avail themselves of the Company's warehousing services do not assume the risks and rewards of ownership over this customer-owned inventory, GAAP prohibits InnerWorkings from recognizing revenue for the customer-owned inventory it warehouses until it delivers that inventory to the customer. This is so, even as the relevant contracts specified that InnerWorkings receive payment for the customer-owned inventory it received in its warehouses.

109. Thus, with Defendants violations of prescriptive GAAP and the Company's own revenue recognition policy, requiring no judgment, but only a review of their own contracts, Defendants knew or were reckless in not knowing

that the financial results that the Company reported during the Class Period were false and misleading. Prior to their issuing their financial statements during the Class Period, Defendants knew or were reckless in not knowing of the likelihood of material misstatements as a direct result of weak internal controls over financial reporting and the Company's failure to apply GAAP to, among other accounts, its lease accounting and inventory accounting.

110. Defendants failed to take proper steps to ensure the adequacy of the internal control and reporting practices when it is clear that the financial reporting practices of a public company are significantly more stringent than that of a privately held company as evidenced by the remediation efforts underway at the company to correct its internal control weaknesses.

111. In addition, the Defendants knew or were reckless in not knowing that their application of GAAP was inappropriate. The errors discussed above were basic elements of GAAP, including when their customers took possession and assumed risk for the products in question.

112. The improper application of controls over financial reporting enabled InnerWorkings to bypass GAAP which resulted in the systematic overstatement of net income that investors used in making investments in InnerWorkings.

113. In addition, Section 13(b) 2 of the Exchange Act entitled *Periodical and Other Reports* states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A. Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> i. transactions are executed in accordance with management's general or specific authorization;
>
> ii. transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
>
> iii. access to assets is permitted only in accordance with management's general or specific authorization; and
>
> iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

114. A strong system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations. It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").[4]

115. The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. More broadly, however, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance;

[4] Generally accepted auditing standards codified in AU §319, Consideration of Internal Control in a Financial Statement Audit, is based on the internal control framework described in the COSO Report. The COSO report was issued in September 1992 as a four-volume set. Additional modifications and updates of the framework have been issued with the most recent Integrated Framework being issued in 2013 as a three-volume set.

namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

116. The COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAP and regulatory requirements. Borrowing from generally accepted auditing standards, the COSO Report defines fair presentation as the following:

- the accounting principles selected and applied have general acceptance;
- the accounting principles are appropriate in the circumstances;
- the financial statements are informative of matters that may affect their use, understanding and interpretation; and
- the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[5]

117. The COSO Report describes internal control within a certain framework that consists of five separate components. It requires that financial

[5] *See* COSO Report, Chapter 3; see also Statement on Auditing Standards No. 69, The Meaning of "Present Fairly in Conformity With Generally Accepted Accounting Principles" in the Independent Auditor's Report (New York: AICPA, 1992).

statements prepared for external use are fairly presented in conformity with generally accepted accounting principles and regulatory requirements. The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

118. Everyone in an organization has responsibility for good internal control. The CEO, however, sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system. The influence of the CEO on an entire organization cannot be overstated."[6] The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business. The Addendum to the COSO Report makes it clear that the CFO – at InnerWorkings, three CFOs, Defendants Spohn, Pritchett, and Hodgkins – plays a critical role with respect to the internal control system.

119. InnerWorkings' CEO, Belcher, and its CFOs, Spohn, Pritchett, and Hodgkins, failed to comply with SEC regulations and the requirements of COSO.

---

[6] COSO Report, Chapter 8, p. 84.

As described herein, there were material weaknesses in internal control at InnerWorkings that were necessary to prepare accurate financial statements and ensure compliance with regulatory filing requirements applicable to public companies. A material weakness is defined by the SEC as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis." The Company's own admissions, on two different earnings calls, in the 2017 10-K, and in the Restatement, make clear that its internal controls were ineffective and materially deficient, causing it to make material errors in revenue recognition. InnerWorkings' internal control system failed to live up to the standards as set forth in the five elements of an internal control framework described above, and Defendants Belcher, Spohn, Pritchett, and Hodgkins thus failed to maintain a proper tone and control awareness that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP. The existence of these material weaknesses enabled the Defendants to recklessly or knowingly misstate InnerWorkings' income and earnings per share throughout the Class Period.

120. Knowing all this, the Individual Defendants signed false SOX certifications in each of the Company's financial statements during the Class

Period, falsely attesting to the effectiveness of the Company's international controls.

## IX. PLAINTIFF'S CLASS ACTION ALLEGATIONS

121. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired InnerWorkings securities publicly traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

122. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, InnerWorkings securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by InnerWorkings or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

123. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

124. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

125. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of InnerWorkings;

c. whether the Individual Defendants caused InnerWorkings to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of InnerWorkings securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

126. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

127. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. InnerWorkings securities are traded in an efficient market;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Plaintiff and members of the Class purchased, acquired and/or sold InnerWorkings securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

128. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

129. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**<u>COUNT I</u>**

**Violations of Section 10(b) of the Exchange Act and**

**<u>Rule 10b-5 against All Defendants</u>**

130. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

131. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

132. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of InnerWorkings securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire InnerWorkings

securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

133. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for InnerWorkings securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about InnerWorkings' finances and business prospects.

134. By virtue of their positions at InnerWorkings, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In

addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

135. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of InnerWorkings securities from their personal portfolios.

136. InnerWorkings showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of InnerWorkings, the Individual Defendants had knowledge of the details of InnerWorkings' internal affairs.

137. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of InnerWorkings. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to InnerWorkings' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of InnerWorkings securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning

InnerWorkings' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired InnerWorkings securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

138. During the Class Period, InnerWorkings securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of InnerWorkings securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of InnerWorkings securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of InnerWorkings securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

139. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

140. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against The Individual Defendants

141. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

142. During the Class Period, the Individual Defendants participated in the operation and management of InnerWorkings, and conducted and participated, directly and indirectly, in the conduct of InnerWorkings' business affairs. Because of their senior positions, they knew the adverse non-public information about InnerWorkings' current financial position and future business prospects.

143. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information

with respect to InnerWorkings' business practices, and to correct promptly any public statements issued by InnerWorkings which had become materially false or misleading.

144. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which InnerWorkings disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause InnerWorkings to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of InnerWorkings within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of InnerWorkings securities.

145. Each of the Individual Defendants, therefore, acted as a controlling person of InnerWorkings. By reason of their senior management positions and/or being directors of InnerWorkings, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, InnerWorkings to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of InnerWorkings and

possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

146. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by InnerWorkings.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XI. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 25, 2018 Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

***Lead Counsel for Plaintiff and Class***

## CERTIFICATE OF SERVICE

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows: I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071. I am over the age of eighteen.

On September 25, 2018, I electronically filed the following **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on September 25, 2018.

/s/ *Laurence M. Rosen*
Laurence M. Rosen